**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **GARTH ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:15-CV-475 (MTT)** |
| | ) | |
| **AMERICAN FAMILY INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Defendant American Family Insurance Company (AFIC) moves for summary judgment on the claims of Plaintiff Garth Anderson.  Doc. 56.  The motion (Doc. 56) is **GRANTED**, and Anderson's claims are **DISMISSED with prejudice**.  Accordingly, Anderson's motion to certify (Doc. 53) and the parties' *Daubert* motions (Docs. 54; 57) are **MOOT**.[1]

## I. BACKGROUND

This is one of several putative class action cases filed in this Court by insureds, all represented by the same lawyers, who claim that their insurers have failed to pay for the diminished value their homes suffered as the result of a loss that is otherwise covered by their insurance policies.  In this context, diminished value has a very specific meaning: the loss in value of a property notwithstanding full repairs due to an intangible stigma owing to the circumstances of the loss.  *See, e.g.*, *John Thurmond & Assocs.,*

---

[1] AFIC also objected to and moved for relief regarding Anderson's response to its statement of material facts (Doc. 62-1) and statement of additional material facts (Doc. 62-2).  Doc. 67.  That motion is **DENIED**.

*Inc. v. Kennedy*, 284 Ga. 469, 471 n.2, 668 S.E.2d 666, 669 n.2 (2008). In *State Farm Mutual Automobile Insurance Company v. Mabry*, the Georgia Supreme Court held, in a class action brought by insureds against their automobile insurer, that automobile insurance policies cover diminished value absent an effective exclusion. 274 Ga. 498, 556 S.E.2d 114 (2001). In *Royal Capital Development LLC v. Maryland Casualty Company*, the Georgia Supreme Court held that the same obligation exists for real property insurers. 291 Ga. 262, 728 S.E.2d 234 (2012). Also, although not applicable here for reasons which will be explained, the Georgia Supreme Court held in *Mabry* that when an insurer improperly denies that its policy covers diminished value, a court may order the insurer to assess the insured's loss for diminished value. 274 Ga. at 509-10, 556 S.E.2d at 123-24.

Georgia homeowners insurers responded in different ways to *Royal Capital*. For example, State Farm Fire and Casualty Company, the defendant in *Thompson v. State Farm Fire and Casualty Company* and *Long v. State Farm Fire and Casualty Company*, chose to ignore *Royal Capital* and flatly denied that its policies covered diminished value. *See, e.g.*, *Thompson*, No. 5:14-cv-32, Doc. 126 at 1; *Long*, No. 5:17-cv-28, Doc. 27 at 3. At the other extreme, First Liberty, the defendant in *Brewton v. First Liberty Ins. Corp.*, No. 5:14-cv-00436 (M.D. Ga. 2017), quickly recognized that *Mabry* and *Royal Capital* say what they plainly say, acknowledged that its policies covered diminished value, and began assessing for diminished value.

The different paths taken by State Farm and First Liberty frame the issues in this case. In *Thompson*, the Court granted the plaintiff's motion to certify a class for "failure to assess" but not for "failure to pay" diminished value. The Court denied class action

status for *Thompson*'s failure to pay class because of concerns over commonality and predominance. *See Thompson*, 2016 WL 951537, at *5-9. The facts giving rise to those concerns are relevant here. It seemed evident that to recover damages for diminished value, it would be necessary for each member of the class to demonstrate that his or her home decreased in value as a result of stigma. State Farm argued that this necessarily individualized process precluded class certification for a failure to pay class. The plaintiffs responded in part by arguing that they intended to prove diminished value through innovative mass appraisal "contingent valuation" methodologies developed by their expert, Dr. John Kilpatrick. As the Court noted at the time, there "is an obvious flaw in this argument—it assumes that every member of the class suffered diminished value and thus that State Farm breached the policies of all class members." *Id.* at 14. Although the plaintiffs' lawyers argued in *Thompson*, as they have here, that they do not contend that diminished value exists in every loss, the Court noted the following in its order denying class certification for failure to pay in *Thompson*:

> Although the Plaintiffs say this, the mass appraisal methodology employed by [Kilpatrick] necessarily concludes that every home in a particular loss scenario suffers diminished value, regardless of the circumstances of a particular loss. (Doc. 74 at 238:19-239:19). Simply put, [Kilpatrick] conducts a survey to determine what a potential buyer would pay—stated as a percentage of fair market value, e.g., 5%, 75%, 135%—for a house after a specific type of loss, e.g., a leaking pipe. (Doc. 52 at 16-18). He averages the responses to determine what the percentage of decrease (or, theoretically, increase) in value losses within that scenario will experience. Of course, every scenario he has run so far results in diminished value even though a substantial number of respondents said they would pay more than fair market value for a properly repaired house. (Doc. 74 at 91:8-92:5, 238:5-18).

*Id.* at *7 n.2.

Thus, Kilpatrick's "proof" that diminished value actually exists in a particular situation and that it exists because of stigma is based not on facts specific to the loss, but rather comes from scenarios that ask what one would, in percentage terms, pay for a house that had, for example, a leaky pipe. The following excerpts from Kilpatrick's testimony at the *Daubert* hearing in *Thompson* illustrate how his survey methodology works:

> Q. So is it, I take it, your opinion that every single time a homeowner has a leaky roof that's replaced, and there's an insurance claim filed on it, one would expect the home to lose between 29 percent and 34 percent of its value, based on your research?
>
> A. Notwithstanding further testing to be done, further evaluations to be done after we've received and validated other lists of properties which have been subjected to that. That's what the preliminary survey research is showing us, yes.

Doc. 74 at 98:24-99:7.

> Q. As I understand your opinions drawn from this survey research, your opinion is that every home that has a toilet overflow will lose between 37 and 39 percent of its fair market value, post-repair; is that correct?
>
> A. I have -- I would suggest to you that that's likely. But we have not gone forward with any further empirical investigation. While these certainly appear to be likely results, I am not ruling out further testing, further empirical investigation. If and as this class is certified.

Doc. 74 at 112:14-22.

> Q. So is it your testimony that every homeowner in Georgia who had an interior water leak that was repaired by the insurance company will experience a 25-percent loss in value of the value of their home?
>
> A. As I've already testified, counselor, that would be an expectation, but it would be subject to further empirical investigation.

Q. So that would mean that a $300,000 house that had an interior pipe leak that costs less than $5,000 to repair, you would expect that house to lose $75,000 in market value?

A. That's the expectation at this point, but, again, that's subject to further empirical investigation at the merits phase of the case.

Q. And that would be the same, based on your opinion, whether or not there was toxic mold found in that house or not? Because that wasn't something that you tested for?

A. That's correct.

Q. So the presence or lack of toxic mold in the house would not, in your opinion, create a greater or lesser diminution in value?

A. That's correct.

Doc. 74 at 118:21-119:16.

Kilpatrick's methodology for determining whether stigma exists and quantifying the diminished value resulting from that stigma raised obvious *Daubert* issues. But even if the *Thompson* plaintiffs, without running afoul of *Daubert*, could have used Kilpatrick's surveys to prove that every class member suffered diminished value, State Farm, the Court ruled, could introduce evidence of the circumstances of particular losses to demonstrate that generalized surveys did not reliably establish stigma or, even if they did, did not reliably quantify the allegedly resulting diminished value. *Thompson*, 2016 WL 951537, at *9. Accordingly, the Court ruled that common issues did not predominate over the individualized issues of fact: which homes had suffered diminished value because of stigma and to what extent.[2] *Id.* That ruling mooted the *Daubert* issues. *Id.* at *13.

---

[2] State Farm filed a discretionary appeal from the denial of class certification, but the Eleventh Circuit declined to hear the appeal. Doc. 94-1. After that, State Farm settled both *Thompson* and *Long*. Doc. 205. Accordingly, in neither case did the Court address the issue of whether or how a given plaintiff could prove that his property suffered diminished value due to stigma.

First Liberty, on the other hand, did not contest that its policies covered diminished value or that it was required to assess its insureds' losses for diminished value. When the plaintiff's lawyers filed suit on Brewton's behalf, they thought First Liberty, like State Farm, took the position that its policies did not cover diminished value and thus had not assessed Brewton's home for diminished value. Because it had in fact done that assessment, First Liberty, naturally enough, moved for summary judgment on Brewton's failure to assess claim. The Court tentatively granted that motion, pending additional discovery on Brewton's allegation that First Liberty's assessment procedure was a "sham" that did not constitute an assessment at all. Doc. 60. After that discovery and supplemental briefing, the Court finalized its ruling, finding that *Mabry* provides an equitable remedy only when an insurer denies coverage for diminished value and refuses to assess for diminished value. Because First Liberty acknowledged that its policies covered diminished value, adopted procedures for assessing insureds' losses for diminished value, and assessed Brewton's loss for diminished value, Brewton had no *Mabry* remedy; if she thought First Liberty's claim payment was inadequate, her remedy, like any other insured who thinks that her insurer has underpaid, was to pursue a claim for the additional amount she thought First Liberty owed. *Brewton*, 2017 WL 5616360, at *7-8.

This case reaches a new question: whether stigma exists in a specific case. AFIC, like State Farm, initially refused to accept that *Royal Capital* made clear that homeowners policies, absent an appropriate exclusion, cover diminished value. Unlike State Farm, AFIC apparently recognized the futility of that position and relented: "We admit that diminished value is an element of loss that is covered." Doc. 81 at 9:10-11.

AFIC now contends that *Daubert* bars Kilpatrick's opinions and that there is no other evidence that the value of Anderson's house decreased as a result of its water leak. AFIC's motion for summary judgment, in relevant part, gets to the heart of the issue: whether Anderson has evidence sufficient for a reasonable jury to find that he has suffered diminished value because of stigma.

This issue is now nothing more than what this Court described in *Brewton* as a garden variety insurance claim. Anderson suffered an admittedly covered loss. He claims that AFIC did not pay him enough for his loss. AFIC claims it did.

Neither *Mabry* nor *Royal Capital* reached this issue. After the Georgia Supreme Court in *Mabry* affirmed the superior court's order that State Farm assess its insureds' losses for diminished value, State Farm settled, agreeing to pay diminished value, presumably on every loss, pursuant to a uniform formula. *See generally* Frank E. Jenkins III & Wallace Miller III, *Georgia Automobile Insurance Law* § 25:2 (2017-2018 Edition). In *Royal Capital*, the Georgia Supreme Court only reached the question of coverage, not whether the plaintiff had actually suffered diminished value. But the Court in *Royal Capital* had a very pertinent observation: diminished value in the case of a fully repaired real property loss would be "unusual." 291 Ga. at 265, 728 S.E.2d at 236-37 (quoting *John Thurmond & Assocs.*, 284 Ga. at 471 n.2, 668 S.E.2d at 669 n.2).[3]

---

[3] The supreme court's observation that diminished value is unusual when real property is fully repaired was clearly meant to distinguish real property from automobiles. This Court has also noted that difference. "Typically, the repair of a wrecked car fixes it. But there is a common perception that a wrecked car loses value notwithstanding complete repairs. Thus, when a CARFAX report, for example, reveals that a car has been damaged in an accident, the value of the car in the eye of a potential purchaser decreases even though the car has been repaired." *Brewton v. First Liberty Ins. Corp.*, 2018 WL 4210776, at *4 (M.D. Ga. 2018). The common idea that a new car loses value when it is driven off the sales lot is another example of how stigma, or perception, can significantly lower a car's value even though it is not in a physically worse condition.

## II. FACTS[4]

In May 2012, Anderson purchased his home for $239,000. Doc. 53-27 at 26:2-4. In January 2014, a pipe in Anderson's home froze and burst while he and his family were on vacation. *Id.* at 71:16-72:2. Anderson reported the loss to AFIC, his homeowners insurer. *Id.* at 70:18-71:13. He also hired an independent public adjuster to negotiate his claim with AFIC. *Id.* at 87:24-88:13. AFIC adjusted Anderson's claim, ultimately paying "in excess of $146,000 in connection with repairs to the home." *Id.* at 123:2-12. But according to Anderson's amended complaint, the value of Anderson's home decreased notwithstanding those repairs, and AFIC failed to compensate him for that diminished value. Doc. 27 ¶¶ 25-28. Anderson alleges that AFIC breached its obligations to assess for diminished value and to pay for diminished value under his homeowners policy. *Id.* ¶¶ 29-31.

Anderson and his family "started thinking about selling" the home in 2015, and they listed the home in July 2016 when they found another home they wanted to buy. Doc. 53-27 at 135:24-136:21. Anderson sold the home for $348,000 with a $3,000 seller's contribution at closing on August 28, 2016. Doc. 59-1 at 1. The Andersons then amended the sale by adding $1,125 to the seller's contribution in order to address HVAC and plumbing issues (unrelated to the 2014 burst pipe) identified by the buyers. Doc. 62-4 at 75:6-24. There is no evidence the 2014 water damage was a factor in the 2016 sale of the home.

---

[4] The facts are undisputed, except where otherwise noted.

### III.  SUMMARY JUDGMENT STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the *non[-]moving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'"  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (emphasis in original).  The moving party "simply may show . . . that there is an absence of evidence to support the non[-]moving party's case."  *Id.* at 1438 (internal quotation marks and citation omitted).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 324).

In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A material fact is any fact relevant or necessary to the outcome of the suit.  *Id.* at 248.  And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  *Id.*

## IV.  DISCUSSION

### A.  AFIC's Summary Judgment Argument

AFIC's motion, in relevant part, gets to the ultimate issue of whether Anderson can show that his home suffered diminished value because of stigma caused by his broken pipe.  Anderson's lawyers interpret AFIC's motion as an attempt to avoid AFIC's duty to assess insureds' losses for diminished value.  But AFIC does not dispute that Anderson's policy covered diminished value or that, in a covered loss like Anderson's, insurers should assess for diminished value.  *See, e.g.*, Hearing on Motion for Summary Judgment and Class Certification, Doc. 81 at 18:14-15 ("[W]e're not denying the existence of a duty [to assess].") 25:23-25 ("So the insured has a right to a diminished value assessment.  And they don't have to do anything to trigger that right.").  AFIC instead argues that it is due summary judgment on Anderson's claim because it fails on the merits.

*Mabry* does not, as Anderson argues, bar the Court from reaching this issue.  As stated above, and throughout these cases, *Mabry* holds that when an insurer improperly denies coverage for diminished value and thus refuses to assess the insured's loss for stigma and any resulting diminished value, the insured is entitled to that assessment.  But the point of the assessment, of course, is to determine whether there is stigma because of a loss.  But if the insurer acknowledges coverage but can establish as a matter of law that the insured's home did not decrease in value because of stigma, that resolves the matter.  There is, then, no need for an assessment.

**B. Whether There Is Sufficient Evidence for a Reasonable Jury to Find that Anderson's Home Suffered Diminished Value**

AFIC contends that Anderson's claim for diminished value "fails because the record contains no evidence supporting his allegation that stigma reduced the market value of his physically-improved home." Doc. 56-1 at 6. AFIC points to undisputed facts and argues that "nothing about the sale process [of Anderson's home in 2016] suggests that a written disclosure of fully repaired damage affected the sale of Anderson's home in any way." *Id.* at 7-8. For example, neither his real estate agent nor, more importantly, potential purchasers voiced any concern about damage from the 2014 water leak. Doc. 62-1 ¶ 15. Also, some of the repairs following the loss were touted by Anderson's realtor as increasing the home's value. Docs. 53-27 at 104:20-119:7; 56-1 at 7; 56-13 at 25:25-26:13, 55:9-56:24. Of course, the fact that the substantial repairs paid for by AFIC may have added value to Anderson's home does not necessarily mean there was no diminished value because of stigma, and to the extent AFIC argues that increased value from repairs negates the possibility of diminished value from stigma, the Court has rejected that argument and rejects it here. *See Thompson*, 264 F. Supp. 3d at 1318. AFIC's relevant point is that the substantial repairs and remediation and the facts surrounding the 2016 sale suggest that Anderson's home had not been stigmatized by the 2014 water damage. The fact that Anderson, in the negotiation of his claim against AFIC, was represented by an independent public adjuster (Doc. 53-27 at 87:24-88:13) buttresses the conclusion that all problems arising from the water leak were addressed, repaired, and remediated, suggesting in turn no residual stigma because of the leak. Furthermore, AFIC argues, nothing about the 2016 sales price suggests any loss of value as the result of stigma

from the 2014 water damage. Doc. 56-1 at 7. In short, AFIC argues, the record contains absolutely no evidence of decreased value as the result of stigma from the leaking pipe.

Because Anderson is the non-moving party but bears the burden of proving his claim at trial, once AFIC has met its burden on summary judgment, Anderson must "show a genuine dispute regarding" AFIC's failure to pay. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324). Anderson argues that the facts, when construed in the light most favorable to him, show that his home did suffer diminished value because of stigma arising from the water damage. Doc. 62 at 6. Anderson points to two pieces of evidence to meet his burden: his deposition testimony that "he believes his home lost value" and what he claims is Kilpatrick's expert opinion that "the post-repair diminished value attributable to the Anderson's [sic] January 2014 water loss was 13%." *Id*. at 14. The Court discusses each in turn.

### 1. Anderson's Deposition Testimony that His Home Suffered Diminished Value Because of Stigma

Anderson, in his brief, argues that he "testified that he believes his home lost value following the January 2014 water loss" and that in Georgia, the owner of property is qualified to state his opinion as to the value of his property if that opinion is based on a proper foundation. Doc. 62 at 14, 14 n.5. Here, in total, is the deposition testimony Anderson cites:

> Q: The next paragraph, paragraph 25, referring to the claim and repair that resulted, says: The repair costs associated with the claim were greater than $90,000. Is that accurate as far as you know?
> A: Yes.
> Q: Despite those repairs, as a result of the water damage to plaintiff's property, the fair market value of plaintiff's property

> was diminished.  Is that—that's an accurate statement of your
> belief?
> A: Yes.

Doc. 53-27 at 59:2-13.  Anderson argues that this is evidence that his home suffered

diminished value, and he cites a district court order stating that in Georgia, "[t]he owner

of property is considered to be qualified to state his opinion as to value when based

upon a proper foundation."  Doc. 62 at 14, 14 n.5 (citing *Matthews v. State Farm Fire &

Cas. Co.*, 2012 WL 12964370, at *7 (N.D. Ga. 2012), *aff'd,* 500 F. App'x 836 (11th Cir.

2012) (internal quotation marks and citation omitted)).

The court in *Matthews* relied on a well-known principle of codified Georgia

common law that likely conflicts with Federal Rules of Evidence 701 but which Georgia

nevertheless retained when it adopted most of the rest of the Federal Rules of

Evidence.  Specifically, O.C.G.A. § 24-7-701(b), formerly codified as O.C.G.A. § 24-9-

66, provides that "direct testimony as to market value is of the nature of opinion

evidence," but a witness "need not be an expert . . . to testify as to [a property's] value if

he or she has an opportunity to form a reasoned opinion."  The plaintiff in *Matthews*, like

Anderson, had sued his insurer because he believed the insurer had underpaid his loss.

The insurer moved for summary judgment, claiming in part that the plaintiff had not

identified an expert to testify about the cost of repairs and that without an expert, the

plaintiff could not prove his case.  *Matthews*, 2012 WL 12964370, at *5.

The plaintiff in *Matthews* was a building contractor who argued that he could

give lay opinions on the cost of repairs.  *Id*. at *6.  The district court did not disagree that

Georgia law allowed lay witnesses to testify about market value but nevertheless

granted the insurer's motion for summary judgment because the plaintiff had not

established a proper foundation for his opinion. *Id.* at *7-8. The plaintiff had based his testimony as to repair cost on his experience as a contractor, and the court found that insufficient to establish the cost of repair. *Id.* at *7; *see also Hutto v. Shedd*, 181 Ga. App. 654, 656, 353 S.E.2d 596, 598 (1987) (finding that homeowners unfamiliar with both building costs and procedures had no basis for testimony as to value). It is apparent that *Matthews*, if anything, demonstrates that Anderson's one-word affirmative response is not admissible evidence of his claimed loss.

This is for at least two reasons. First, a lay opinion on value must be based upon a proper foundation, and Anderson offers no foundation for his "opinion" that his home suffered diminished value. There is nothing to suggest that he "had an opportunity to form a reasoned opinion" that his home suffered diminished value. O.C.G.A. § 24-7-701(b). He has certainly not been "shown to have adequate relevant knowledge," nor has he "give[n] reasons for his or her opinion" as the plaintiff did in the Georgia Court of Appeals case which *Matthews* cites. There, the plaintiff had "testified that he is a real estate investor, that he repairs houses, and that he has done contracting work," and he had "inspected the property after the fire, took many pictures, and listed the items that needed repair." *Mayfield v. State*, 307 Ga. App. 630, 633, 705 S.E.2d 717, 720-21 (2011). Anderson, by contrast, has not testified to any basis for his opinion.

Second, by its terms O.C.G.A. § 24-7-701(b) contemplates evidence regarding the "market value" of "an article or property." Anderson does not opine on the market value of his home. Rather, he offers his testimony that stigma caused the value of his

home to decrease.  Anderson has not shown any authority supporting his application of O.C.G.A. § 24-7-701(b) to his causation opinion.[5]

For these reasons, Anderson's testimony does not constitute evidence of diminished value as the result of stigma.

### 2. Dr. Kilpatrick's Opinion that Anderson's Home Suffered Diminished Value Because of Stigma

Anderson relies on what he says is the expert opinion of Dr. John A. Kilpatrick to demonstrate the diminished value he claims he suffered as the result of stigma.  Doc. 62 at 14.  As discussed above, the plaintiffs' lawyers retained Kilpatrick in the diminished value class action cases filed in this Court because of his claimed ability to do mass appraisals.  The plaintiffs hoped Kilpatrick could quantify the diminished value sustained by each—and every—member of the class.  This Court in *Thompson* refused to certify a failure to pay class, in part because of the need to take into account facts specific to each individual loss in reaching determinations of diminished value, something that Kilpatrick's mass appraisal did not do.  The plaintiffs' attorneys have not given up hope; they continue to push for certification of "failure to pay" classes, and they continue to use Kilpatrick.  But the question now is whether Kilpatrick has provided Anderson, not a mass of class members, with admissible evidence of diminished value arising from stigma caused by his broken pipe.

Kilpatrick's expert report in this case is mostly a cut and paste of his reports used in previous cases.  Consequently, the vast bulk of his report discusses issues relevant to a *potential* class of insureds pursuing claims for the alleged diminished value of their

---

[5] In addition, AFIC argues, correctly, that federal law, rather than Georgia law, should apply.  Doc. 74 at 9. O.C.G.A. § 24-7-701(b) conflicts with Federal Rule of Evidence 701, which does not have an analogous exception to its prohibition on non-expert testimony.

homes and what Kilpatrick would do for the class if a class were certified. Still, it is helpful to look first to Kilpatrick's summary of his opinions:

> From all of my research gathered for this report, it is my opinion that the water, mold, fire, and foundation and/or structural damage **can** result in diminution in value due to stigma even after the physical damage has been fully repaired; and, therefore, all properties with such repaired damage, for which insurance claims were made and paid, have the **potential** to endure additional losses in value. The only way to determine whether a property has suffered diminution in value, and the extent of the value diminution, if any, to each property, is to assess the properties in the before (prior to water damage) and after (post repair to the water damage) conditions in accordance with generally accepted appraisal standards, including the methodologies described herein.

Doc. 53-17 ¶ 236 (emphases added).

The first point Kilpatrick makes in his summary—that diminished value *can* exist because of stigma even though the property has been repaired—is offered to support the argument that insurers have a duty to assess putative class members' losses for diminished value. That opinion, on which Kilpatrick spends much time, has no direct relevance to the issue of whether Anderson's home *actually* suffered diminished value because of stigma. His summary also references the methodologies that Kilpatrick plans to use to demonstrate the amount of diminished value class members suffered. Kilpatrick's lengthy discussion in his report about how he plans to employ those methodologies could be relevant now (assuming the reliability of those methodologies) if Kilpatrick actually used them to reach an opinion that the value of Anderson's home *did* decrease as the result of stigma.

On that issue—whether Anderson's home actually suffered diminished value—the most relevant point Kilpatrick makes in his summary is this:

> The only way to determine whether a property has suffered diminution in value, and the extent of the value diminution, if any, to each property, is to assess the properties in the before (prior to water damage) and after (post repair to the water damage) conditions[.]

Doc. 53-17 ¶ 236. Kilpatrick has held firm to that opinion, and the plaintiffs' attorneys have relied heavily on that opinion to rebut the insurers' arguments that a later sale of a home is relevant to the question of whether a home has suffered diminished value due to stigma.

Consistent with this, Anderson's brief in response to AFIC's motion for summary judgment claims that Kilpatrick "analyzed the unimpaired and impaired value of [Anderson's] home and concluded that, within a reasonable degree of appraisal certainty, the post-repair diminished value attributable to the Anderson's [sic] January 2014 water loss was 13%." Doc. 62 at 14. It is true that Kilpatrick said that the proper way to assess for diminished value is to compare the value of the home in its pre-loss condition (its unimpaired value) and its post-repair condition (its impaired value). And in his report, Kilpatrick clearly did opine on the unimpaired value of Anderson's home: he says it was worth $316,184. Doc. 53-17 at 40, 72. But he did not opine on the home's impaired value. And the Court could find nowhere in his report a conclusion, or any analysis supporting a conclusion, that the January 2014 water loss caused 13% in diminished value. *Id.* This was puzzling. Evidently Anderson's lawyers, as evidenced by their voluminous briefing, and Kilpatrick, as evidenced by the lengthy discussion in his report about what he *proposes* to do when a class is certified, were still in a class

action mindset.  But AFIC attacks Anderson's individual claim, asserting there is no evidence of diminished value attributable to stigma.  To survive summary judgment, it is necessary for Anderson to come up with such evidence.  Recognizing this, Anderson's lawyers represented that Kilpatrick had supplied that evidence.

Specifically, Anderson cites paragraph 236 of Kilpatrick's report for the proposition that Kilpatrick opined that Anderson's home decreased 13% in value as a result of stigma.  Doc. 62 at 14.  And, indeed, it is only in that paragraph of the report that "13%" appears:

> In the case of the Anderson property, the post-water damage sales transaction data [that is, information from Anderson's August 2016 sale of his home] indicate that the diminution in price to the home after property damage repairs is approximately 13%.  However, this is admittedly a single data point in a hot real estate market, which may not adequately reflect an equilibrium value diminution effect.

*Id.* ¶ 236. It is surprising that Anderson represents paragraph 236 to be Kilpatrick's post-repair opinion of the impaired value of Anderson's home.  Paragraph 236 does not say that, and Kilpatrick does not claim that.  Paragraph 236 instead concerns a "secondary" valuation Kilpatrick did based on the price Anderson's home sold for in 2016 compared to what comparative sales data show the house should have sold for.  *Id.* ¶¶ 232-34.[6] All it represents is an *apparent* price differential that existed in 2016, for unstated

---

[6] Kilpatrick's expert report uses data from the Federal Housing Finance Agency's Housing Price Index to calculate "the expected price the property would have sold for if unimpaired."  Doc. 53-17 ¶ 233.  Doing so for the Atlanta-Sandy Springs-Roswell area, according to Kilpatrick, showed that the "property should have sold for roughly . . . 10.67% more than the actual sales price."  *Id.*  Calculating the Housing Price Index using only properties in Anderson's ZIP code showed, instead, that "the Anderson property should have sold for approximately . . . 12.94% more."  *Id.* ¶ 234.  Apparently the 13% decrease comes from some unstated extrapolation from 10.67% and 12.94%.

reasons.[7] There are problems with this secondary valuation,[8] and to avoid those problems, Anderson made clear in his response to AFIC's *Daubert* attack on this opinion that Kilpatrick's 2016 valuation based on sales data "is *not* the basis for Kilpatrick's opinion of the home's diminished value in January 2014." Doc. 63 at 46 (emphasis in original). Indeed, after Anderson cites paragraph 236 as his evidence that his home suffered diminished value due to stigma, he then, on the very next page of his brief, argues that the 2016 sale was irrelevant. Doc. 62 at 14; Doc. 62-2 ¶ 29; Doc. 62 at 15 ("Yet AFIC points to facts surrounding the sale of the property 2.5 years after the loss, which says nothing about whether diminished value existed in January 2014—the relevant point in time."). So the Court is surprised that Anderson cites paragraph 236

---

[7] As the Court noted in denying State Farm's motion for summary judgment in *Thompson*, many factors, including claimed improvements to a property, affect the sale of a single home, and just because some of those factors allow a homeowner to sell his home for a relatively high value does not necessarily mean that he is not owed payment for diminished value. *Thompson*, 264 F. Supp. 3d at 1316. Of course, the converse is also true: if a home sells for lower than what the market might expect, a variety of factors may be the cause, and diminished value at the time of the loss is not established by the mere fact of a below-market sale.

Indeed, some factors which could contribute to a below-market sale are apparent in this case. Here, for example, Anderson wanted to sell the home promptly because he had made a contingent offer on another house, and his family and he decided to drop the price in order to sell more quickly. Doc. 53-27 at 136:4-21, 155:16-22. The home also needed repairs unrelated to the flooding incident, which led to negotiations bringing the sale price down further. *See* Docs. 62-4 at 70:11-23, 73:5-15; 59-2 at 1. Further, one potential buyer told his realtor that he did not like the fact that the view from the home's front windows was limited to the highly-sloping front lawn and worried about future flooding from rainwater (which, of course, was not the reason for the January 2014 incident). Doc. 56-15. Another described the lack of a back yard as a "negative." Doc. 56-16. That potential buyer's real estate agent further felt that "the home would show better if it w[ere] depersonalized a bit. Maybe less photos of the family would help." *Id.*

[8] First, as Anderson notes, diminished value is properly "determined at the time of the loss[.]" Doc. 63 at 45-46. So it is not determined by an assessment—much less the price of a sale—more than two years after the loss. Second, paragraph 236 says the home sold for less than the approximate amount the model would predict for an unimpaired home, but it does not say that this deviation was necessarily unlikely or unusual, even by the model's terms. Doc. 53-17 at 73. When the Defendants attempt to supply Kilpatrick's missing confidence interval for unimpaired value and find the 2016 sale price falls within that interval, Anderson replies by pointing out that the August 2016 analysis is not the basis for his assertion of diminished value. Doc. 63 at 46.

for the proposition that his home was worth 13% less immediately after repairs were completed *and* that this decrease was the result of stigma.

The Court then looked to Anderson's briefing in response to AFIC's *Daubert* motion for some evidence that Kilpatrick had assessed the property in its post-repair condition.  There, Anderson cites Kilpatrick's expert report at paragraphs 48-49, 160,[9] 216, and 220 for the proposition that "[r]econciling three metrics, Kilpatrick concluded that the Anderson home suffered 13% diminished value."  Doc. 63 at 45.  And in his response affidavit opposing AFIC's experts, Kilpatrick, referring to his expert report, states, in conclusory fashion, that he "did appraise the Anderson property and determined that, based on the aggregation of evidence . . . the Anderson home property suffered a diminution in value of 13%."  Doc. 53-18 ¶ 13.  Later in that response affidavit, Kilpatrick, again referring to his initial expert report, gets a bit more specific; he states that using relevant literature, case studies, and a previously-used survey, he "concluded to a reasonable degree of appraisal certainty that the Anderson property sustained a diminution in value of approximately 13% as a result of its water loss event at issue."  *Id.* ¶ 87.  The references to literature, case studies, and a "previously-used survey" are consistent with the citation to paragraphs 48-49, 160, 216, and 220 in Anderson's brief in response to the *Daubert* motion.

---

[9] The citation to paragraph 160 is particularly misleading.  In Anderson's *Daubert* response, Anderson describes paragraph 160 of Kilpatrick's expert report as "Anderson property falls at the low end of the case study range (12.8%) after reconciling facts."  Doc. 63 at 45.  Paragraph 160 of Kilpatrick's report is actually the following two sentences, located above a table of case studies Kilpatrick considered: "The case studies I considered are briefly summarized in Table 5 with more comprehensive summaries immediately following the table.  Diminution in value due to the relevant damage types ranged from 12.8% to 50% of otherwise unimpaired values, but most of the case study evidence indicated losses in value between 20% and 30%."  Doc. 53-17 ¶ 160.

But to the extent these representations are intended to suggest that Kilpatrick assessed Anderson's home in its post-repair condition, they are inaccurate.  Nowhere in his expert report does Kilpatrick "conclude[] that, within a reasonable degree of appraisal certainty, the post-repair diminished value attributable to the Anderson's [sic] January 2014 water loss was 13%."  Doc. 62 at 14; *see also* Doc. 53-18 ¶ 87.  Nor is there any analysis or discussion suggesting that he even attempted to assess Anderson's home in its immediate post-repair condition.

Nor is such an opinion found, as far as the Court can tell, in Kilpatrick's deposition.  Kilpatrick was not asked directly about an opinion that Anderson's home decreased 13% in value because of stigma, no doubt because his expert report does not state that opinion.  But he did testify about what he did when he appraised Anderson's home.  He testified that he did perform an inspection of Anderson's home on January 24, 2017; but when he did so he "was valuing the property as if unimpaired." Doc. 62-9 at 146:10-22.  He did not go inside the house or interview Anderson about his loss, and his recollection is that the inspection probably took less than an hour.  *Id.* at 150:5-25.  The appraisal report that resulted from that inspection was not, Kilpatrick testified, a "diminished value appraisal," which "would take into account some condition which had diminished the value of the property relative to properties which did not have that condition."  *Id.* at 152:12-21.  That is because the purpose of the inspection was not to determine whether Anderson's home suffered diminished value, but rather "to obtain an estimate of the fair market value as of January 6, 2014, immediately prior to the water loss." *Id.* at 152:9-13; Doc. 53-17 ¶ 108.

AFIC was also confounded by Anderson's argument in response to its motion for summary judgment that Kilpatrick had found that Anderson's home diminished by 13% in value as a result of stigma. "Notably, this 13% figure does not correspond to percentages reported for either the 'case studies' or the contingent valuation survey, but only Kilpatrick's AVM analysis." Doc. 74 at 5. AVM refers to automated valuation models, the method Kilpatrick used to determine the expected price of Anderson's home when it sold in 2016. Doc. 53-17 ¶¶ 232-34. Apparently, AFIC did not pick up on Anderson's admission that Kilpatrick's opinion based on the 2016 sale of his house was not evidence of diminished value resulting from stigma. But AFIC's point is well taken—the "13% figure" is not found in Kilpatrick's case studies or survey.

Tellingly, Kilpatrick also discusses in his report further steps that he *could* take in order to calculate diminished value "[i]f the class is certified." *See id.* ¶ 223. In paragraph 223, Kilpatrick states: "If the class is certified, then my staff and I would conduct a new focus group in the exact same way in Atlanta, Georgia," and, for the class, a Georgia-wide survey. His summary of the surveys he discusses in his report is found in Table 6 of his report, which is entitled "Open-Ended Results for Water Damage Scenario in the [Thompson v.] State Farm Matter." Doc. 59-4 at 63. Clearly, the survey Kilpatrick did in *Thompson* was not intended for use in this case, hence the need for the Atlanta survey. Thus, the new survey would be used to establish the diminished value of Anderson's home. Although Kilpatrick says he would expect the new survey "to produce similar results within a reasonable level of statistical confidence due to the recentness of the previous survey in the same geographical location" (Doc. 59-4 ¶ 223), the point is that a new study would be necessary. Kilpatrick clearly contemplated taking

additional measures before opining on diminished value resulting from stigma in this case.  But even assuming the *Thompson* survey could have been used to support an opinion that diminished value due to stigma exists here, Kilpatrick never did that.  In short, Kilpatrick's report talks about what he will do, not what he has done, and certainly not what he has done to appraise Anderson's home for diminished value.

Anderson has not presented any evidence that would allow a reasonable jury to find that AFIC is liable to him for failure to pay for diminished value due to stigma.

## V. CONCLUSION

For the reasons discussed above, AFIC's motion for summary judgment (Doc. 56) is **GRANTED**, and Anderson's motion to certify class (Doc. 53) and the parties' *Daubert* motions (Docs. 54; 57) are **MOOT**.

**SO ORDERED**, this 15th day of October, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT